Barry I. Levy (BL 2190)
Michael Sirignano (MS 5263)
Max Gershenoff (MG 4648)
RIVKIN RADLER LLP
926 RXR Plaza
Uniondale, New York 11556
(516) 357-3000

*Counsel for Plaintiff, State Farm Mutual Automobile
Insurance Company*

**FILED**
IN CLERK'S OFFICE
U.S. DISTRICT COURT E.D.N.Y

★   JUL 1 3 2009   ★

LONG ISLAND OFFICE

**CV-09 2990**

UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF NEW YORK

-------------------------------------------------------------------X

STATE FARM MUTUAL AUTOMOBILE
INSURANCE COMPANY,

　　　　　　　　　　　　　Plaintiff,

　　　　-against-

BARRY COHAN, D.D.S.,

　　　　-and-

DENTAL HEALTH CARE, P.C.,
NEW YORK DENTAL PAIN, P.C.,
LONG ISLAND DENTAL PAIN, P.C.,

　　　(collectively the "Dental PCs")

　　　　　　　　　　　　　Defendants.

-------------------------------------------------------------------X

SEYBERT, J.

Docket No.:_____(　　)

WALL, M.J.

**Plaintiff Demands a Trial by
Jury**

## COMPLAINT

Plaintiff, State Farm Mutual Automobile Insurance Company (hereinafter referred to as "State Farm" or "Plaintiff"), by and through its counsel Rivkin Radler LLP, as and for its Complaint against the Defendants, Barry Cohan, D.D.S., Dental Health Care, P.C., New York Dental Pain, P.C., Long Island Dental Pain, P.C. (collectively "Defendants"), hereby alleges as follows:

## INTRODUCTION

1.      This action seeks to recover more than Eight Hundred Thousand ($800,000)
Dollars that Defendants wrongfully have obtained from State Farm by submitting hundreds of
fraudulent bills for medically useless dental services, orthotic devices (i.e. "mouthguards") and
physical therapy services that were purportedly provided to individuals ("Insureds") who were
claimed by the Defendants to have suffered from temporomandibular joint dysfunction
("TMJ/TMD") as a result of being involved in automobile accidents which rendered them
eligible for coverage under State Farm insurance policies.   For almost five (5) years, the
Defendants engaged in a scheme through which they wrongfully obtained hundreds of thousands
of dollars from State Farm, and continue to attempt to do so to this day.

2.      The Defendants carried out their scheme to defraud State Farm by setting up a
series of professional service corporations known as Dental Health Care, P.C., New York Dental
Pain, P.C. and Long Island Dental Pain, PC (collectively referred to the "Dental PCs").   The
Dental PCs, though ostensibly organized for the purpose of providing dental goods, dental
services and physical therapy services, were actually created for the sole purpose of facilitating a
fraudulent treatment and billing scheme against State Farm.

3.      While the fraudulent scheme involved multiple components, there was one
common purpose, i.e. to maximize the charges for first-party benefits ("No-Fault Benefits") that
could be submitted to State Farm under New York's Comprehensive Motor Vehicle Insurance
Reparations Act (N.Y. Ins. Law §§ 5101 et. seq.) and the regulations promulgated thereunder (11
N.Y.C.R.R. §§ 65 et. seq.) (collectively the "No-Fault Laws").   The components of the fraudulent
scheme included the submission of charges for dental goods and services that were (i) never

provided; (ii) medically useless and rendered pursuant to a fraudulent pre-determined protocol; and (iii) not authorized under the applicable fee schedules. Another component of the scheme was to maximize the profits of the Dental PCs by "unbundling" services (i.e. submission of multiple charges for related services despite the existence of a single charge) and "upcoding" (i.e. submission of a charge at a value higher than the service actually performed). Examples of "unbundling" and "upcoding" are described in more detail below. Another component of the fraudulent scheme involved the submission of charges for dental goods and services that were provided (if at all) by individuals who were never employed by the Dental PCs, but rather, were independent contractors. The Defendants' fraudulent scheme commenced in or about 2000 and continues through the present day.

4.    In addition to seeking more than Eight Hundred Thousand ($800,000) Dollars in compensatory damages as well as punitive damages, State Farm also seeks a declaration that it is not legally obligated to pay reimbursement of an additional five hundred thousand ($500,000.00) dollars in pending fraudulent claims that were submitted through the Dental PCs for dental goods and services allegedly rendered to its Insureds.

## THE PARTIES

### I.    Plaintiff

5.    Plaintiff State Farm is an Illinois corporation with its principal place of business in Bloomington, Illinois. State Farm is authorized to conduct business and to issue automobile insurance policies in the State of New York.

3

## II.     Defendants

6.     Defendant Barry Cohan, D.D.S. ("Dr. Cohan") resides in and is a citizen of the State of New York. Dr. Cohan has been authorized to practice dentistry in the State of New York since 1981. In December 1998, Dr. Cohan was found guilty of professional misconduct by the New York State Department of Education, including – among other things – filing false claim forms with insurance companies and failing to maintain patient records for an appropriate period of time. (A copy of the findings made by the Department of Education are attached hereto as Exhibit "1") In 2007, an indictment was issued against Dr. Cohan by a grand jury sitting in the United States District Court for the Eastern District of New York. The Indictment contended that Dr. Cohan, between July 1, 2004 and May 1, 2006, submitted more than $600,000 in false claims to Metropolitan Life Insurance Company, seeking payment for dental procedures that were purportedly administered to employees of the Port Authority of New York and New Jersey and their eligible dependents.  (A copy of the Indictment is attached hereto as Exhibit "2")  Dr. Cohan entered into a plea agreement with the United States of America which will result in his incarceration for multiple years and the forfeiture of the $600,000 that he wrongfully obtained. The plea agreement was accepted by the United State District Court for the Eastern District of New York on June 10, 2009. (A copy of the Minute Entry from the Court is attached hereto as Exhibit "3")

7.     Defendant Dental Health Care, P.C. ("DHC") was incorporated on March 17, 2000, and purports to be a professional service corporation organized and existing under the laws of the State of New York. According to the New York Department of State, DHC is located at 38 West Park Avenue, Long Beach, New York. In reality, however, DHC's principal place of

business is at more than 10 clinics located throughout the New York City metropolitan area at which Insureds allegedly were treated.

8.    Defendant New York Dental Pain, P.C. ("NYDP") was incorporated on February 28, 2003, and purports to be a professional service corporation organized and existing under the laws of the State of New York. According to the New York Department of State, NYDP is located at 38 West Park Avenue, Long Beach, New York. In reality, however, NYDP's principal place of business is at more than 10 clinics located throughout the New York City metropolitan area at which Insureds allegedly are treated.

9.    Defendant Long Island Dental Pain, P.C. ("LIDP") was incorporated on February 28, 2003, and purports to be a professional service corporation organized and existing under the laws of the State of New York. According to the New York Department of State, LIDP is located at 38 West Park Avenue, Long Beach, New York. In reality, however, LIDP's principal place of business is at more than 10 clinics located throughout the New York City metropolitan area at which Insureds allegedly are treated.

## JURISDICTION AND VENUE

10.    This Court has jurisdiction over the subject matter of this action under 28 U.S.C. §1332(a)(1) because the matter in controversy exceeds the sum or value of $75,000.00, exclusive of interest and costs, and is between citizens of different states. Pursuant to 28 U.S.C. § 1331, this Court also has jurisdiction over the claims brought under 18 U.S.C. §1961 et seq. (the Racketeer Influenced and Corrupt Organizations ("RICO") Act) because they arise under the laws of the United States. In addition, this Court has supplemental jurisdiction over the subject

5

matter of the claims asserted in this action pursuant to 28 U.S.C. §1367, and under the Declaratory Judgment Act, 28 U.S.C. §§2201 and 2202.

11.     Venue in this District is appropriate pursuant to 28 U.S.C. §1391, as the Eastern District of New York is the District where one or more of the Defendants reside and because this is the District where a substantial amount of the activities forming the basis of the Complaint occurred.

### ALLEGATIONS COMMON TO ALL COUNTS

**I.     New York's No-Fault Laws**

12.     State Farm underwrites automobile insurance in the State of New York.

13.     Under New York's No-Fault Laws, insurers are required to provide No-Fault Benefits to their policyholders and other eligible Insureds.

14.     Under the No-Fault Laws, Insureds can assign their right to No-Fault Benefits to professional health service providers, as long as the providers meet applicable New York State and local licensing requirements. With a duly executed assignment, a healthcare provider may submit claims directly to an insurance company, and receive payment for medically necessary services, using the claim form approved by the New York State Department of Insurance (known as the "Verification of Treatment by Attending Physician or Other Provider of Health Service," or, more commonly, as an "NF-3").

15.     No-Fault Benefits may include expenses incurred by Insureds for medically necessary dental goods and services as well as for physical therapy services.

16.     Furthermore, to be eligible for reimbursement under the No-Fault Laws, a professional corporation, as assignee, is entitled to payment from an insurer only if it is the actual

provider of the billed-for services. A professional corporation's use of independent contractors, rather than employees, to provide health services renders the professional corporation ineligible to receive reimbursement under the No-Fault Laws. See 11 N.Y.C.R.R. §65-3.11(a).

17.    Pursuant to N.Y. Ins. Law § 403, the NF-3s (i.e. claim forms) must be verified by the healthcare provider subject to the following warning:

> Any person who knowingly and with intent to defraud any insurance company or other person files an application for insurance or statement of claim containing any materially false information, or conceals for the purpose of misleading, information concerning any fact material thereto, commits a fraudulent insurance act, which is a crime.

18.    To support their claims for No-Fault Benefits, the Defendants, using the facade of the Dental PCs, submitted NF-3 Forms, narrative reports, letters of medical necessity and other medical records to State Farm. To promptly process the claims, as it is required to do, State Farm justifiably relied upon the information that the Dental PCs submitted in support of their claims for No-Fault Benefits, and as a result has paid the Dental PCs more than Eight Hundred Thousand ($800,000) Dollars.

## II.    The Referral Clinics – the Fraud Centers

19.    The Dental PCs did not maintain stand-alone practice locations, were not owners of or leaseholders in the locations from which they operated, did not advertise for patients, and did not employ their own support staff. Rather, the Dental PCs operated solely through a network of high volume "clinics" located throughout the greater New York metropolitan area (hereinafter the "Referral Clinics"), including – but not limited to – the following:

| Clinic | Address |
| --- | --- |
| Prairie Medical PC | 502 Atlantic Avenue, Brooklyn, New York |
| Boston Road Medical, PC | 40-10A Boston Road, Bronx, New York |
| Jamaica Health Care Medical | 118-11 Guy Brewer Boulevard, Jamaica, New York |
| Primerica Medical PC | 97-13 101 Avenue, Ozone Park, New York |
| Hempstead Pain & Medical Services PC | 135 Main Street, Hempstead, New York |
| Drivas Medical Care PC | 205-45 Linden Blvd, St. Albans, New York |
| AMB Medical PLLC | 40-60 Warren Street, Elmhurst, New York |
| Webster Diagnostic Medicine PC | 2876 Nostrand Avenue, Brooklyn, New York |
| Slamowitz Chiropractic Center | 279 Burnside Avenue, Lawrence, New York |
| Miller Medical Care PC | 2783 Atlantic Avenue, Brooklyn, New York |
| Kimball Medical PC | 310 Merrick Avenue, Merrick, New York |

20.     Though ostensibly organized to provide a range of healthcare services to Insureds at a single location, these Referral Clinics in actuality were organized to facilitate fraudulent treatment and billing schemes aimed at State Farm, and to provide medically useless services to maximize charges that could be submitted for each Insured.   Typically, these Referral Clinics housed one or more of the Dental PCs, as well as other professional corporations that ostensibly provided chiropractic, physical therapy, acupuncture and psychology services.

21.     The Dental PCs, like the other professional corporations operating from the Referral Clinics, gained access to the Referral Clinics through the payment of kickbacks to the

Referral Clinic owners, who were not dentists. The kickbacks were disguised as ostensibly legitimate fees to "rent" or "lease" space, equipment, or personnel from the Referral Clinics, or for "management" or "billing and collection" services allegedly provided by the Referral Clinics. In fact, these were nothing more than "pay to play" arrangements that caused the Referral Clinics to provide access to their patients and to steer the patients to the Dental PCs, without regard for whatever their individual symptoms – if any – might be.

22.     The Defendants used the steady stream of Insureds at the Referral Clinics to generate "patients" and the resulting fraudulent bills. More specifically, when an Insured entered a Referral Clinic, a receptionist or some other non-medical personnel would make referrals to the Dental PCs and would do so regardless of whether the Insured actually complained of mouth or jaw pain or had suffered facial or jaw trauma in the underlying automobile accident. In cases where the Insured would question the dental referral, he or she would generally be told that it is part of the treatment regimen or the "package" within the Referral Clinic, and that it was mandatory.

23.     The Defendants knew that the Referral Clinic referrals were fraudulent, and in fact paid the Referral Clinics to generate the fraudulent referrals. This allowed the Defendants to maximize the volume of Insureds to which they would have access and to maximize the billing for medically useless dental goods and services.

III.     **The Scheme**

     **A.     The Treating Dentists**

24.     Part and parcel of the scheme, the Defendants established associations with several dentists who were licensed to practice in the State of New York, including but not limited

to the following: (i) Rebekah Kane, D.D.S., (ii) Daniel Aldieri, D.D.S., (iii) Allen Motola, D.D.S., (iv) Jonathan Wachspress, D.D.S., (v) Joan Van Raalte, D.D.S., (vi) Donald Jacobson, D.D.S., (vii) Konstantin Levin, D.D.S.,[1] (viii) Stanley Frankel, D.D.S., and (ix) Barnet Weinstein, D.D.S.. (collectively referred to as the "Treating Dentists").

25.    The Treating Dentists were paid a daily per diem generally ranging from $350.00 to $500.00 per day and paid on a 1099 basis. The Treating Dentists were given protocols to follow and scheduled to appear at the various Referral Clinics where the patients would be directed to present themselves to them as a result of the referral and kickback relationships between the Defendants and the Referral Clinics. (Attached as Exhibit "4" is the affidavit of Stanley Frankel, DDS which describes significant components of the scheme and the Treating Dentists alleged role in detail).

**B.    Basic Legitimate Protocols for TMJ Disorder**

26.    Temporomandibular joint ("TMJ") disorders ("TMD") are a group of conditions that affect the temporomandibular joint and the muscles that control chewing. The National Institute of Dental and Craniofacial Research (the "National Institute") has stated that:

> [F]or most people, pain in the area of the jaw joint or muscles is not a signal that a serious problem is developing. Generally, discomfort from TMD is occasional and temporary, often occurring in cycles. The pain eventually goes away with little or no treatment. Only a small percentage of people with TMD pain develop significant, long-term symptoms.

27.    Because most TMD problems are temporary and do not get worse, any legitimate TMD treatment protocol begins with simple treatment steps. As the National Institute has noted,

---

[1]    In March 2004, the New York State Attorney General filed an indictment against Levin for engaging, with others, in a far-reaching scheme to defraud insurance carriers of an estimated one million ($1,000,000.00) dollars

"[s]imple treatment is all that is usually necessary to relieve discomfort." In a legitimate protocol, the initial treatment typically is the prescription of a non-steroidal, anti-inflammatory analgesic, such as ibuprofen or naproxen sodium. Generally, the patient is placed on a soft-food diet, told to apply heat or ice packs as needed, and to avoid extreme jaw movements such as those attendant to wide yawning, loud singing, or gum chewing. In some circumstances, the patient might be shown gentle muscle-stretching and relaxing exercises to perform at home.

28.     If the TMD symptoms do not subside following the treatment set forth above, the National Institute indicates that a healthcare provider might then recommend a "splint" or "bite plate." Splints, or bite plates, are pre-fabricated, plastic guards that fit over the upper or lower teeth. The splint can, in some instances, help reduce clenching or grinding, which eases muscle tension and relieves TMD. The National Institute recommends, however, that splints or bite plates "be used only for a short time to avoid causing permanent changes in the bite."

29.     Absent any indication of fracture or dislocation, legitimate TMD treatment protocols generally do not include x-rays or other diagnostic imaging.

30.     Absent exceptional circumstances, legitimate protocols for TMD generally do not include physical therapy modalities, let alone multiple physical therapy modalities two-to-four times per week for two-to-three weeks – the typical, medically unnecessary "regimen" prescribed by the Treating Dentists and billed through the Dental PCs.

### C.     **The Fraudulent Treatment Scheme**

(i)     Fraudulent Initial Examination Reports, Diagnostic Testing, and Phony Diagnoses

31.     Once an Insured received a fraudulent referral from one of the Referral Clinics, he or she would typically see Dr. Cohan or one of the Treating Dentists that same day at the Referral

11

Clinic. In cases in which Dr. Cohan or one of the Treating Dentists actually conducted a patient examination, they asked a boilerplate checklist of questions about the Insured's medical history and/or symptoms. Dr. Cohan or the Treating Dentists then purportedly prepared a report of the Insured's history and/or symptoms, allegedly based on the Insured's responses (the "Initial Examination Report"). In some cases, Dr. Cohan or the Treating Dentists prepared Initial Examination Reports out of whole cloth, because they never actually treated or even met the Insureds at all – they simply copied the Insureds' information from records maintained by the Referral Clinics, then submitted a phony bill to State Farm which purported that they provided treatment to the Insured.

32.     The Initial Examination Reports routinely reported symptoms of some form of dental distress, including but not limited to jaw pain, clicking, and locking; headaches; head pain; throat pain; ear pain; chewing pain; or ringing in the ears. The Initial Examination Reports reported such symptoms whether or not the Insured actually presented with them – indeed, whether or not the Insured ever met with Dr. Cohan or one of the Treating Dentists at all. The Initial Examination Report results had little to do with the Insured's actual complaints – if any.

33.     The actual purpose of the Initial Examination Report was to support a fraudulent TMD diagnosis. No matter what, if anything, actually was wrong with the Insured, the Initial Examination Report typically would conclude that the Insured had "pain in his TMJ, difficulty opening and other symptoms related to TMJ dysfunctions." In other instances, the Initial Examination Reports would include as a matter of course – boilerplate, one-sentence excerpts from several studies linking automobile accidents to TMD. Then, the Initial Examination

12

Reports simply concluded that the Insured suffered from TMD based solely on the fact that the Insured was involved in an automobile accident.

34.     In many cases, the purported symptoms stated on the Initial Examination Report did not accurately reflect the Insureds' responses to the inquiries of Dr. Cohan or the Treating Dentists. Other than the individual Insureds' patient histories, the bulk of the Initial Examination Reports essentially were identical, and were deliberately fabricated by Dr. Cohan and the Treating Dentists to support a TMD diagnosis. These false diagnoses, in turn, were used by the Defendants to support the Dental PCs' submission of a pre-determined, laundry-list of fraudulent charges to State Farm and other insurers. (Representative samples of virtually identical, fraudulent Initial Examination Reports are annexed hereto as Exhibit "5").

35.     The Defendants typically billed State Farm $230.09 for the false or pre-determined initial examinations using CPT Code 99245.   During the initial examinations, however, the Defendants realized additional profits by conducting medically useless diagnostic testing, typically occlusion analysis, range of motion testing, and/or muscle testing – purportedly to determine whether or not the Insured suffered from TMD.

36.     These fraudulent diagnostic tests were performed on a uniform basis, without regard for any given Insured's symptoms. In many cases, the Defendants billed State Farm for diagnostic testing purportedly conducted on Insureds after the Insureds already had received a diagnosis. The sole purpose of these diagnostic tests was to enable the Defendants to maximize their ill-gotten profit, and the fraudulent diagnostic testing typically added more than $130.00 to an Insured's initial examination bill.

13

(ii)     The Fraudulent Mouth Guards

37.     The Initial Examination Reports specifically were geared to support the prescription of an orthotic device (a "mouth guard"), the most profitable element of – and the driving force behind – the Defendants' fraudulent "treatment" and "billing" scheme. Essentially, the orthotic device prescribed by the Treating Physicians was nothing more than a cheap plastic mouth guard.

38.     Generally, the Initial Examination Reports contained the following deliberate misrepresentation, or a variant thereof:

> [Insured] was given anti-inflammatory medication in an effort to increase healing. He was instructed to begin a soft food diet, to refrain from opening his jaw wide, and to utilize hot compresses particularly at night. After two weeks it was decided that a dental orthotic be utilized as symptoms persisted.

39.     The Defendants included this statement in each of the Initial Examination Reports in order to mislead State Farm into believing that the mouth guard was prescribed only because the Insured's symptoms did not resolve after more conservative forms of treatment.  In actuality, Dr. Cohan or the Treating Dentists virtually always prescribed the mouth guards on the Insureds' first visit. Indeed, the Insureds generally only met a single dentist on a single occasion (when they met the dentist at all), so there is no way that Dr. Cohan or any of the Treating Dentists could have legitimately decided to prescribe an orthotic device "[a]fter two weeks" "as symptoms persisted."

40.     The mouth guards were prescribed for the Insureds despite the fact that the mouth guards were not medically necessary. The fraudulent prescriptions were generated solely to maximize the profits that the Defendants could reap from each Insured.

14

41.     The mouth guard aspect of the Defendants' fraudulent scheme – the main profit center in the enterprise – typically proceeded as follows: (i) first, Dr. Cohan or one of the Treating Dentists would take dental casts from the Insureds' mouths during the initial examination; (ii) second, the Defendants would mail the casts to one of two laboratories that worked in collusion with the Defendants; (iii) third, the laboratories would receive the casts several days after they were taken, would fabricate the mouth guards based upon the casts, and would mail the mouth guards to the Defendants; and (iv) fourth, the Defendants would mail the mouth guards to the Insureds, who generally would receive them several weeks after the initial examinations.

42.     Though the Defendants virtually always represented that the mouth guards were "custom fitted," typically there was never a follow-up examination or fitting – the Insureds simply received the mouth guards in the mail. Because the mouth guards simply were mailed to the Insureds without any follow up consultations or actual custom fitting, the Insured was subjected to the risk of dental injury, including the risk of creating TMD that never existed in the first instance.

43.     The Defendants paid the laboratories – one of which was owned by Fred Cohan, Dr. Cohan's father – between $50.00 and $100.00 to fabricate the cheap plastic mouth guards. In turn, the Defendants usually billed State Farm either $1,204.00 or $3,152.00 per Insured for the medically unnecessary mouth guards using CPT Codes 20110 and/or 20999.

(iii)    The Medically Unnecessary "Physical Therapy"

44.     In addition to the fraudulent initial examinations, diagnostic tests and mouthguards, the Defendants generated another fraudulent revenue stream through the delivery

of bogus "physical therapy" services. These physical therapy services – when they actually were provided at all – were not medically necessary and provided no benefit to the Insureds.

45.     As a matter of course, Dr. Cohan or one of the Treating Dentists would conclude in the Initial Examination Reports that the Insured required two-to-three weeks of TMD physical therapy following the initial examination. The Initial Examination Reports generally also recited that the physical therapy should consist of treatments including electro-stimulation, infrared light therapy, hot and cold packs, facial massage, and therapeutic exercises. Specifically, the Initial Examination Reports routinely contained the following boilerplate language:

> The treatment program includes activities to improve function (97530), electrical stimulation (97032), functional exercises (97530), hot and cold packs (97010), insertion of mandibular orthopedic appliance (20999), moist heat (97010), TENS (97014), and ultrasound (97035). Physical therapy is given to the TMJ (jaw area).
> . . .
> I have recommended that [Insured] begin therapy immediately with re-examination in approximately 2-4 weeks. Estimated treatment time is 3-6 months. It is also my recommendation that [Insured] be referred for acupuncture therapy as well as occupational therapy for posture and proper eating/sleeping habits.

46.     Though the billing that the Defendants submitted to State Farm represented that the dentist actually carried out the physical therapy, the treatments actually were provided by individuals who are not dentists and who were never actually employed by the Dental PCs.

47.     Not only were the physical therapy services medically unnecessary, they frequently never were provided to the Insureds at all.

**IV.     The Fraudulent Billing**

**A.     Fraudulent Billing for Dental Goods and Services**

48.     Once the Insured was subjected to the pre-determined set of medically useless dental goods and services, the Defendants would submit an initial bill to State Farm. These bills,

16

submitted through the Dental PCs, were virtually always identical and contained – at a minimum – the following entries:

| CPT/CDT Code | Procedure | Charge |
| --- | --- | --- |
| 99245 | Initial Office Visit | $230.09 |
| 20999 | Orthotic Device (By Report) | $1,204.72 |
| 21110 | Orthotic Device (By Report) | $3,152.00 |
| 470 | Diagnostic Cast | $44.21 |
| 95851 | Range of Motion Testing | $45.71 |
| 95831 | Muscle Testing | $43.60 |

(Examples of the fraudulent bills for dental goods and services are annexed hereto as Exhibit "6").

49.　　To expedite their submission of such fraudulent billing to State Farm and other insurers, the Defendants typically did not even bother to vary their entries from bill-to-bill. Instead, they simply reused old bills over and over again, inserting the specific Insured's name, and including the purported initials of Dr. Cohan or one of the Treating Dentists who allegedly met with the Insured.

　　(i)　　The Fraudulent Upcoding

50.　　Each bill that the Defendants submitted to State Farm used CPT Code 99245, which misrepresented that the initial examination allegedly performed by Dr. Cohan or one of the Treating Dentists: (i) consisted of a face-to-face visit of approximately 80 minutes; (ii) involved medical problems of moderate-to-high severity; and (iii) involved medical decision-making of high complexity. In fact, the initial examination – to the extent it actually occurred at all – typically: (i) involved a face-to-face visit of less than 25 minutes; (ii) concerned problems – to

17

the extent there were any – of low severity; and (iii) involved no medical decision-making because the fraudulent "treatment" protocol was pre-determined.

51. As a result of these misrepresentations, the Defendants claimed that the Dental PCs were entitled to reimbursement for the initial examination in the amount of $230.09. Had the Defendants not misrepresented the nature of the initial examinations, the Dental PCs would have been entitled to receive – at most – $109.34 in reimbursement.

(ii)    The Fraudulent Unbundling

52. In addition, the bills submitted to State Farm by the Defendants typically misrepresented that the range of motion (CPT Code 95851) and muscle testing (CPT Code 95831) were conducted on the Insureds some time after the initial examinations were performed. Generally, each test was billed to State Farm as independent services performed on separate and distinct days. To conceal this fraudulent unbundling, the Initial Examination Reports deliberately were prepared by the Defendants to omit any references to the dates on which the range of motion and muscle testing allegedly occurred.

53. In fact, the range of motion and muscle testing – to the extent they actually were performed at all – were conducted by Dr. Cohan or one of the Treating Dentists as part and parcel of the initial examination, and generally took less than one-to-two minutes. As a result, the range of motion and muscle testing should have been included within the charge for the initial examination. Defendants misrepresented the dates of service and unbundled the range of motion and muscle testing from the initial examinations in order to inflate the fraudulent billing that they could submit to State Farm.

54. As the result of the misrepresentations contained in the bills submitted by the Defendants to State Farm, State Farm was defrauded into paying more than $100.00 per Insured for unbundled range of motion and muscle testing.

(iii) The Fraudulent Billing for Mouth Guards

55. As noted above, the Defendants usually billed State Farm either $1,204.00 or $3,152.00 per Insured for the medically unnecessary mouthguards. This charge represented anywhere from a 1,200% to 6,000% percent markup over the actual cost of the plastic mouth guards.

56. The CPT billing codes that the Defendants used to justify their exorbitant charge for the mouth guards, typically either 20110 or 20999, are not authorized under the Dental Fee Schedule. Both the 20110 and the 20999 CPT Codes are located in the Surgery Chapter of the Workers' Compensation Medical Fee Schedule (the "Fee Schedule"). Even if the mouth guards were medically necessary – which they were not – the applicable code under the Dental Fee Schedule is 04630. Dental Fee Schedule code 04630 specifies that the maximum authorized charge for an actual, custom-fitted orthotic device is $383.00.

57. The Defendants' use of CPT Codes 20110 and 20999 are fraudulent for several reasons:

(i) The Surgery Ground Rules specifically state that the surgical codes and relative charges in the Fee Schedule "were determined uniquely for surgery services." The Defendants' perfunctory fabrication and mailing of the mouth guards to the Insureds does not represent a surgical service.

(ii) CPT Code 20110 is defined as the "[a]pplication of interdental fixation device for conditions other than fracture or dislocation, includes removal." This CPT Code specifically contemplates that a health care provider will engage in both the surgical insertion and removal of a device to wire an Insured's teeth or jaw. The Defendants' perfunctory fabrication and mailing of the mouth guards to the

Insureds does not represent the type of services described or contemplated by that code.

(iii)    CPT Code 20999 is a "by report" code and therefore does not have a relative value – i.e., a fixed, applicable charge. CPT Code 20999 is defined as "[u]nlisted procedure, musculoskeletal system, general." Under the Fee Schedule, a "by report" code is reserved for services that are "too unusual or variable to be assigned a relative value." Pursuant to Ground Rule 10 of the Surgery Chapter, the use of the "by report" code requires the healthcare provider to document, among other things: (1) the patient's post-operative diagnosis; (2) the location and number of lesions or procedures; (3) the complete description of the major surgical procedure; (4) the closest similar procedure; and (5) the actual operative time. The Defendants' perfunctory fabrication and mailing of the mouth guards to the Insureds does not represent a surgical service, nor does the Defendants' billing set forth the information required by Ground Rule 10.

58.    The Defendants deliberately misrepresented the nature of the mouth guards and other dental goods and services allegedly provided to the Insureds in order to maximize the amount that they could fraudulently bill to State Farm.

**B.**    **The Fraudulent Billing for Physical Therapy Services**

59.    In addition to the Defendants' fraudulent billing for the initial examinations, diagnostic testing, and mouth guards, the Defendants typically submitted additional fraudulent billing to State Farm for the purported "physical therapy" services. These physical therapy bills purported to include the initials of Dr. Cohan or one the Treating Dentists, and generally contained three or more of the following entries:

| CPT/CDT Code | Procedure | Charge |
| --- | --- | --- |
| 97014 (CDT) | Electrical Stimulation (facial) | $22.48 |
| 97035 (CDT) | Ultrasound (facial) | $23.89 |
| 97026 (CDT) | Infrared Application (facial) | $23.89 |
| 97124 (CDT) | Therapeutic Massage | $24.73 |
| 97010 (CDT) | Hot/Cold Pack | $20.03 |
| 97110 (CDT) | Therapeutic Exercises (facial) | $33.54 |

(Examples of the fraudulent physical therapy bills are attached hereto as Exhibit "7").

60.     Typically, following the false "recommendations" contained within the Initial Examination Reports, the Defendants would submit several rounds of physical therapy billing for each Insured. Accordingly, the aforesaid charges were multiplied for each day that the Insureds purportedly received physical therapy.

61.     The Fee Schedule limits the amount of physical therapy that may be reimbursed for any single Insured on any single day. More specifically, the Physical Medicine section of the No-Fault Fee Schedule, Section Eight, Paragraph 11, provides that "[w]hen multiple physical medicine procedures and/or modalities are performed on the same day, reimbursement is limited to 8.0 units or the amount billed, whichever is less. The following codes represent the physical medicine procedures and modalities subject to this rule: 97010 ... 97014 ... 97026 ... 97110 ... 97124." (The relevant pages from the Fee Schedule Ground Rules are attached hereto as Exhibit "8").

62.     Despite this provision, the Defendants fraudulently billed State Farm for physical therapy that they knew exceeded the eight-unit limit and which, in any event: (i) was never actually provided; (ii) was not medically necessary; and (iii) was not performed by a physical therapist employed by – or even affiliated with – the Dental PCs.

63.     In addition, on the same day that the Insureds received "facial" physical therapy – if any – they also received other physical therapy for other parts of their bodies performed by the same physical therapist, but billed to State Farm under the tax identification number of the Referral Clinic.  The Defendants knew that the Insureds received separate physical therapy on other parts of their bodies on the same dates when they purportedly received "facial" physical

therapy. Indeed, the separate, "non-facial" physical therapy received by the Insureds is a key component of the Defendants' fraudulent scheme, because the "facial" physical therapy – when it actually was provided at all – was provided by the same individuals who provide the "non-facial" physical therapy.

### C. The Fraudulent Billing for Goods and Services That Never Were Provided

64. In addition to billing for patients who did not require any goods or services, in many instances the Defendants also fraudulently billed for goods and services that never actually were provided at all, and generated fraudulent supporting documentation to substantiate the bogus charges.

65. To advance this scheme, the Defendants obtained the names of Insureds who were being treated by non-dental PCs operating from the Referral Clinics – i.e., Insureds receiving "treatment" from the medical PCs, chiropractic PCs, physical therapy PCs, psychology PCs, or acupuncture PCs that worked side-by-side with the Dental PCs in the Referral Clinics. Then, the Defendants prepared fraudulent NF-3 forms for the Insureds even though the Insureds never received any dental goods or services.

### D. The Fraudulent Billing for Independent Contractor Services

66. Under the No-Fault Laws, professional service corporations (i.e. the Dental PCs) are ineligible to bill or receive payment for goods or services provided by independent contractors – the applicable goods or services must be provided by the professional corporations, themselves, or by their employees.

67. In furtherance of the Defendants' fraudulent billing scheme, each bill submitted through the Dental PCs purports to bear the initials of the Treating Defendant who allegedly

22

treated the Insureds. At the same time, the tax identification numbers included in the billing correspond with one or another of the Dental PCs.

68.     Each bill submitted through the Dental PCs either misrepresented that the Treating Dentists were employees of the Dental PCs, or intentionally omitted any information identifying the legal relationship between the Treating Dentists and the Dental PCs.

69.     To the extent that the billing submitted by the Defendants to State Farm represented that the Treating Dentists were employees of the Dental PCs, that representation was false and fraudulent because the Treating Dentists actually were independent contractors, the Defendants knew that the Treating Dentists were independent contractors, and the Defendants misrepresented the Treating Dentists' employment status solely to avoid the effect of the No-Fault Laws and to maximize their ill-gotten gains.

70.     To the extent that the billing submitted by the Defendants to State Farm failed to disclose that the Treating Dentists were independent contractors, such information was omitted intentionally to avoid the legal effect of the No-Fault Laws.

71.     In actuality, Dr. Cohan and the Dental PCs:

    (i)     paid the Treating Dentists on a 1099 basis rather than a W-2 basis;

    (ii)    established an understanding with the Treating Dentists that the Treating Dentists were independent contractors, rather than employees;

    (iii)   paid no employee benefits to the Treating Dentists;

    (iv)    failed to secure and maintain W-4 or I-9 forms for the Treating Dentists;

    (v)     failed to withhold federal, state or city taxes on behalf of the Treating Dentists;

(vi)    required the Treating Dentists to pay for their own malpractice insurance at their own expense;

(vii)    permitted the Treating Dentists to set their own schedules and days on which they desired to perform services;

(viii)    permitted the Treating Dentists to maintain non-exclusive relationships and perform services for their own practices and on behalf of other dental practices;

(ix)    failed to cover the Treating Dentists either for unemployment or workers' compensation benefits; and

(x)    filed corporate and payroll tax returns (e.g. Internal Revenue Service ("IRS") forms 1120 and 941) that represented to the IRS and to the New York State Department of Taxation that the Treating Dentists were independent contractors.

72.    Since 2001, the New York State Insurance Department has consistently reaffirmed its longstanding position that professional corporations are not entitled to receive reimbursement under the No-Fault Laws for healthcare providers performing services as independent contractors. See DOI Opinion Letter, February 21, 2001 ("where the health services are performed by a provider who is an independent contractor with the PC and is not an employee under the direct supervision of a PC owner, the PC is not authorized to bill under No-Fault as a licensed provider of those services"); DOI Opinion Letter, February 5, 2002 (refusing to modify position set forth in 2-11-01 Opinion letter despite a request from the New York State Medical Society); DOI Opinion Letter, March 11, 2002 ("If the physician has contracted with the PC as an independent contractor, and is not an employee or shareholder of the PC, such physician may not represent himself or herself as an employee of the PC eligible to bill for health services rendered on behalf of the PC, under the New York Comprehensive Motor Vehicle Insurance Reparations Act..."); DOI Opinion Letter, October 29, 2003 (extending the independent contractor rule to

hospitals); See DOI Opinion Letter, March 21, 2005 (DOI refused to modify its earlier opinions based upon interpretations of the Medicare statute issued by the CMS).(Copies of the relevant DOI Opinion letters are attached hereto as Exhibit "9")

73.    Dr. Cohan and the Dental PCs knowingly and intentionally treated the Treating Dentists as independent contractors instead of employees to maximize the Dental PCs' profits and – by extension – maximize the proceeds from Defendants' fraudulent scheme. By treating the Treating Dentists as independent contractors, the Defendants were able to maximize their ill-gotten gains by:

    (i)     avoiding the need to prepare W-2 forms, collect and remit the income tax owed by Treating Dentists as required by 26 U.S.C. § 3102 and state law;

    (ii)     avoiding payment of the FUTA excise tax required by 26 U.S.C. § 3301 (6.2 percent of all income paid);

    (iii)     avoiding payment of the FICA excise tax required by  26 U.S.C. § 3111 (7.65 percent of all income paid);

    (iv)     avoiding payment of workers' compensation insurance to cover the Treating Dentists as required by the New York Workers' Compensation Law § 10;

    (v)     avoiding the need to secure any malpractice insurance to cover the Treating Dentists;

    (vi)     avoiding claims of agency-based liability arising from the Treating Dentists' work; and

    (vii)     avoiding payment to the Treating Dentists on a salary, rather than per diem, basis.

74.    Furthermore, the Defendants submitted physical therapy billing to State Farm in which they deliberately misrepresented the identity of the purported therapists. Though the physical therapy billing submitted by the Defendants to State Farm purports to bear the initials of

25

one or another of the Treating Dentists, the physical therapy in fact was provided – when it was provided at all – by third parties. These third-party physical therapists either had no relationship to the Dental PCs at all, or were independent contractors. Even so, the Defendants fraudulently billed for these third-party physical therapy services as if they were provided by actual employees of the Dental PCs, and falsely initialed the billing to make it appear as if the relevant services were provided by one of the Treating Dentists.

75.     The Defendants' misrepresentations and/or omissions were consciously designed to mislead State Farm into believing that it was obligated to pay the Dental PCs' billing, when in fact State Farm was not legally obligated to do so.

76.     Representative examples of the Defendants' fraudulent treatment and billing scheme include:

**Claim No.: 32-V467-006          Patient: 1**

The Insured had no dental complaints when she visited Prairie Medical, PC, a Referral Clinic. Even so, she was referred to DHC, where she saw a dentist on only one occasion. Though the Insured had no actual dental complaints, DHC billed State Farm more than $4,000.00 for purported goods and services, including: (i) office visits; (ii) multiple physical therapy sessions; (iii) diagnostic testing; and (iv) a mouth guard billed to CPT Code 20999 at $3,152.00 – which was mailed to the Insured, not custom-fitted. Notably, though the Insured saw a dentist only once, DHC submitted billing that purported to cover multiple office visits.

**Claim No.: 32-A042-531          Patient: 2**

The Insured had no dental complaints when she visited Miller Medical Care, PC, a Referral Clinic. Nonetheless, she was referred to DHC. Though the Insured had no dental complaints, DHC billed State Farm more than $4,000.00 for purported goods and services, including: (i) office visits; (ii) multiple physical therapy sessions; (iii) diagnostic testing; and (iv) a mouth guard billed to CPT Code 20999 at $3,152.00 – which was mailed to the Insured, not custom-fitted.

**Claim No.: 32-A047-081**         **Patient: 3**

The Insured had no dental complaints when he visited the Referral Clinic. Even so, he was automatically referred to LIDP, which billed State Farm for more than $3,500.00 in purported goods and services, including: (i) a supposed 80-minute, face-to-face dental examination; (ii) diagnostic testing; and (iii) a mouth guard.

**Claim No.: 32-A038-347**         **Patient: 4**

The Insured, stated during an examination under oath that she injured her leg, back, neck, and shoulders during an automobile accident. Shortly thereafter, she visited Boston Road Medical, PC, a referral clinic, where she complained of the leg, back, neck, and shoulder injuries. Though the Insured did not complain of any dental injuries, and did not even remember whether she was referred to a dentist, DHC nonetheless billed State Farm more than $4,500.00 for purported goods and services, including: (i) initial and follow-up office visits; (ii) multiple physical therapy sessions; (iii) diagnostic testing; and (iv) a mouth guard billed to CPT Code 20999 at $3,152.00 – which was mailed to the Insured, not custom-fitted.

**Claim No.: 32-V475-341**         **Patient: 5**

The Insured, purportedly was examined at NYDP. NYDP billed State Farm $230.09 under CPT Code 99245 for this supposed, face-to-face, 80-minute initial examination. During this purported examination, NYDP determined that the Insured did not suffer from TMD. Even so, NYDP billed State Farm for diagnostic testing that supposedly was conducted after the Insured already received a diagnosis.

**Claim No.: 32-V431-884**         **Patient: 6**

The Insured stated during an examination under oath that she met with a DHC dentist for an initial examination that lasted "maybe twenty minutes." DHC, however, billed State Farm $230.09 under CPT Code 99245 – the code used for a face-to-face visit of approximately 80 minutes. Furthermore, DHC billed State Farm $3,152.00 under CPT Code 20999 for a mouth guard that the Insured stated that she never received.

**Claim No.: 32-A045-712**         **Patient: 7**

The Insured, had no dental complaints when he visited Drivas Medical Care, PC, a Referral Clinic. Nonetheless, he automatically was referred to NYDP. Though the Insured had no dental complaints, NYDP billed State Farm more than $4,500.00 for purported goods and services including: (i) an 80-minute office

visit; (ii) multiple physical therapy sessions; (iii) diagnostic testing; and (iv) a mouth guard.

**Claim No.: 32-V471-566**  **Patient: 8**

The Insured purportedly was examined at NYDP. NYDP billed State Farm $230.09 under CPT Code 99245 for this supposed, face-to-face, 80-minute initial examination. During this purported examination, NYDP determined that the Insured did not suffer from TMD. Even so, NYDP billed State Farm for diagnostic testing that supposedly was conducted after the Insured already received a diagnosis.

**Claim No.: 32-V428-079**  **Patient: 9**

The Insured had no dental complaints when she visited Miller Medical Care, PC, the Referral Clinic. Even so, she was referred to DHC. Though the Insured had no dental complaints, DHC then billed State Farm more than $4,500.00 for purported goods and services, including: (i) office visits, including a supposed 80-minute initial examination; (ii) multiple physical therapy sessions; (iii) diagnostic testing; and (iv) a mouth guard billed at $3,152.00 – which was mailed to the Insured, not custom-fitted.

**Claim No.: 32-V429-334**  **Patient: 10**

Not only did the Insured have no dental complaints when she visited the Referral Clinic – she actually never received any dental treatment at all. Nonetheless, DHC billed State Farm more than $4,500.00 for purported goods and services, including: (i) office visits, including a supposed 80-minute initial examination; (ii) multiple physical therapy sessions; (iii) diagnostic testing; and (iv) a mouth guard billed at $3,152.00 – which was mailed to the Insured, not custom-fitted.

## VII.   State Farm's Justifiable Reliance

77.    The Defendants, either individually or as representatives of the Dental PCs, have attested to: (i) the medical necessity of the initial examinations, diagnostic testing, mouth guards, physical therapy, and other goods and services that they have prescribed and allegedly performed; (ii) the legitimacy and propriety of the charges that they have submitted to State Farm; and (iii) the Dental PCs' eligibility and legal standing to present and collect upon the bills that have been

28

submitted. The Defendants, both individually and/or as representatives of the Dental PCs, are obligated – legally and ethically – to act honestly and with integrity.

78.     State Farm reasonably believed that the Defendants as well as those associated with the Dental PCs were law abiding, and that the Treating Dentists and Dr. Cohan were bound by their avowed ethical obligations.

79.     To induce State Farm to promptly pay the fraudulent charges, the Defendants have retained law firms to submit all of the above-described documents to State Farm to collect the charges. Implicit in the submissions is the threat of expensive and time-consuming arbitration or litigation if State Farm fails to promptly pay the Defendants' charges in full.

80.     The Defendants attempted to conceal the true nature of their fraudulent enterprise from State Farm by submitting fraudulent billing through various of the Dental PCs at different times, under different tax identification numbers. For instance, the Defendants first began to submit billing through DHC in 2000. In an effort to conceal the volume and nature of the fraudulent billing submitted to State Farm, the Defendants submitted DHC billing under two separate tax identification numbers: 112800667 and 113571901.   Thereafter, Defendants incorporated NYDP and LIDP, with new tax identification numbers, and in May 2003 began submitting fraudulent billing through those Dental PCs, instead of using DHC.

81.     State Farm is under statutory and contractual obligations to promptly and fairly process claims within 30 days. The documents Defendants submitted to State Farm in support of the fraudulent charges at issue, combined with the material misrepresentations and omissions as more fully described above, were designed to and did cause State Farm to justifiably rely upon

them. As a result, State Farm paid more than Eight Hundred Thousand ($800,000) Dollars based upon the fraudulent charges.

## FIRST CAUSE OF ACTION AGAINST THE DENTAL PCS
### (Declaratory Judgment – 28 U.S.C. §§ 2201 and 2202)

82.     State Farm incorporates, as though fully set forth herein, each and every allegation in paragraphs 1 through 81, above.

83.     There is an actual case in controversy between State Farm and the Dental PCs as to all professional charges, including charges for the initial examinations, diagnostic testing, dental goods and services, and physical therapy services that have not been paid.

84.     In each and every claim submitted to State Farm, the Dental PCs knowingly have misrepresented that the goods and services were provided by the Dental PCs' employees, when in fact the Treating Dentists and physical therapists were independent contractors or not affiliated with the Dental PCs at all and that the dental goods and services allegedly provided by the Dental PCs were medically necessary and/or actually provided, when in fact they were not.

85.     Accordingly, State Farm requests a judgment pursuant to the Declaratory Judgment Act, 28 U.S.C. §§ 2201 and 2202, declaring that:

(i)     The Dental PCs have no right to receive payment on any pending or future bills submitted to State Farm because the invoiced goods and services were provided by independent contractors or unrelated third parties, not the Dental PCs' employees; and

(ii)    The Dental PCs have no right to receive payment on any pending or future bills submitted to State Farm because the goods and services purportedly provided by the Dental PCs were not medically necessary and/or were not provided at all.

## SECOND CAUSE OF ACTION AGAINST ALL DEFENDANTS
### (Violation of RICO, 18 U.S.C. § 1962(c))

86.     State Farm incorporates, as though fully set forth herein, each and every allegation in paragraphs 1 through 85, above.

87.     Defendants are an association-in-fact "enterprise" (the "Cohan Dental Network Enterprise") as that term is defined in 18 U.S.C. § 1961(4), that engaged in, and the activities of which affected, interstate commerce. The members of the Cohan Dental Network Enterprise are and have been associated through time, joined in purpose, and organized in a manner amenable to hierarchical and consensual decision-making with each member fulfilling a specific and necessary role to carry out and facilitate its purpose. Specifically: (i) Dr. Cohan acted as the owner, sole shareholder, director and officer of the Dental PCs, created the fraudulent treatment and billing protocols that were used to generate and collect the fraudulent charges, arranged for the referral and kickback relationships with the Referral Clinics and arranged for the association and compensation arrangements between the Dental PCs and the Treating Dentists; (ii) The Dental PCs were created and operated to facilitate the submission of fraudulent billing and collection of monies for dental and physical therapy goods and services that never were provided, were medically useless, or were provided by independent contractors; (iii) The Dental PCs intentionally were created under three different corporate names in order to reduce the number of bills submitted under any one individual corporate name, in an attempt to avoid attracting the attention and scrutiny of State Farm and other insurers with respect to the volume of billing submitted by any one company.

88.     The development and execution of the Defendants' scheme would exceed the capabilities of each member of the Cohan Dental Network Enterprise acting singly or without the aid of each other.

89.     The Cohan Dental Network enterprise is distinct from and has an existence beyond the individual Dental PCs and the pattern of racketeering that is described below, in that it retained or contracted with technicians, dentists (including the Treating Dentists), and other administrative personnel to create the false appearance of legitimate dental service providers. It also entered into arrangements with the Referral Clinics to secure access to a steady stream of Insureds from those clinics, owned or leased equipment to use in connection with the pre-determined fraudulent treatment protocols, maintained records regarding the services allegedly provided to the Insureds, prepared and submitted bills as well as narrative reports and other documents to support claims for payment, and engaged in collection activities.

90.     Each of the Defendants is or was employed by and/or associated with the Cohan Dental Network Enterprise.

91.     Each of the Defendants knowingly conducted and/or participated, directly or indirectly, in the conduct of the Cohan Dental Network Enterprise through a pattern of racketeering activity consisting of repeated violations of the federal mail fraud statute, 18 U.S.C. §1341, based upon the use of the United States mails to submit or cause to be submitted thousands of fraudulent bills on a continuous basis for more than four years as well as subsequent efforts to collect on the fraudulent bills through the present day. Representative examples of the acts of mail fraud include, but are not limited to, those described in the Appendix, attached hereto as Exhibits "10" and "11".

92.     State Farm has been injured in its business and property by reason of the above-described conduct in that it has paid at least Eight Hundred Thousand ($800,000) Dollars pursuant to the fraudulent bills submitted by the Defendants through the Dental PCs.

93.     By reason of its injury, State Farm is entitled to treble damages, costs, and reasonable attorneys' fees pursuant to 18 U.S.C. §1964(c), and any other relief the Court deems just and proper.

### THIRD CAUSE OF ACTION AGAINST ALL DEFENDANTS
### (Common Law Fraud)

94.     State Farm incorporates, as though fully set forth herein, each and every allegation in paragraphs 1 through 93, above.

95.     The Defendants intentionally, knowingly, and with intent to deceive State Farm submitted Initial Examination Reports, treatment verifications, and bills for dental services, testing, orthotic appliances, and physical therapy that contained false and fraudulent statements of material fact, including but not limited to the following:

(i)     False and deceptive statements with respect to the Insureds' treatment and care, including the dates when services allegedly were rendered;

(ii)    False and deceptive statements and information with respect to the existence and/or extent of the Insureds' symptoms and injury, as well as the results of the testing and treatment purportedly performed;

(iii)   False and deceptive statements and information intended to hide the fact that: (1) the referrals to the Dental PCs were unnecessary; (2) the testing, treatment, and orthotic appliances were not provided to the Insureds; and (3) the testing, treatment, and orthotic appliances were medically unnecessary;

(iv)    False and deceptive statements and information intended to hide the fact that the bills submitted to State Farm by the Defendants included: (1) fraudulently upcoded services; and (2) fraudulent unbundling of services, all of which were

33

carried out in order to defraud State Farm out of additional monies to which the Defendants were not entitled;

(v)     False and deceptive statements and information intended to deceive State Farm into believing that the Defendants' bills for the orthotic appliances were justified and that the charges were appropriate; and

(vi)    False and deceptive statements and information intended to deceive State Farm into believing that the Dental PCs were eligible for reimbursement under the No-Fault Laws, when in fact they were not eligible because the testing, examinations, treatments, orthotics, and physical therapy services were provided and/or prescribed by independent contractors, not employees of the Dental PCs.

96.     Defendants made the false and fraudulent statements described above and concealed the material facts described above with knowledge of the falsity and for the specific purpose of inducing State Farm to pay for dental services, testing, orthotic appliances, and physical therapy services that were not compensable under the No-Fault Laws.

97.     State Farm justifiably relied to its detriment on the Defendants' false and fraudulent representations as well as their fraudulent concealment as set forth herein. As a direct and proximate result, State Farm has been damaged in an amount exceeding Eight Hundred Thousand ($800,000) Dollars.

98.     Defendants' extensive fraudulent conduct demonstrates a high degree of moral turpitude and wanton dishonesty, which entitles State Farm to recover punitive damages.

99.     Accordingly, State Farm is entitled to compensatory and punitive damages, together with interest and costs, and any other relief the Court deems just and proper.

### FOURTH CAUSE OF ACTION AGAINST ALL DEFENDANTS
**(Unjust Enrichment)**

100.    State Farm incorporates, as though fully set forth herein, each and every allegation in paragraphs 1 through 99, above.

34

101.   As set forth above, all Defendants have engaged in improper, unlawful, and/or unjust acts, all to the harm and detriment of State Farm.

102.   State Farm paid the bills and charges submitted by or on behalf of the Dental PCs for No-Fault benefits, it reasonably believed that it was legally obligated to make such payments based on Defendants' improper, unlawful, and/or unjust acts.

103.   Defendants have been enriched at State Farm's expense by State Farm's payments which constituted a benefit that Defendants voluntarily accepted notwithstanding their improper, unlawful, and unjust billing scheme.

104.   Defendants' retention of State Farm's payments violates fundamental principles of justice, equity and good conscience.

105.   By reason of the above, the Defendants have been unjustly enriched in an amount to be determined at trial, but in no event less than the total sum of Eight Hundred Thousand ($800,000) Dollars.

## JURY DEMAND

106.   State Farm hereby demands a trial by jury.

## REQUEST FOR RELIEF

WHEREFORE, State Farm Mutual Automobile Insurance Company respectfully requests judgment as follows:

A.   On the First Cause of Action against the Dental PCs, a declaratory judgment providing that the Dental PCs have no right to receive payment on any pending or future bills submitted to State Farm;

35

B.       On the Second Cause of Action against all Defendants, compensatory damages in an amount to be determined at trial, but presently believed to exceed Eight Hundred Thousand ($800,000) Dollars, together with treble damages, costs, and reasonable attorneys' fees pursuant to 18 U.S.C. § 1964(c) plus interest;

C.       On the Third  Cause of Action against all Defendants, for compensatory damages in an amount to be determined at trial, but presently believed to exceed Eight Hundred Thousand ($800,000) Dollars, together with punitive damages, costs, interest and such other and further relief as this Court deems just and proper;

D.       On the Fourth Cause of Action against all Defendants, for an amount to be determined at trial, but presently believed to exceed Eight Hundred Thousand ($800,000) Dollars, plus costs and interest; and

E.       Such other and further relief as the Court may deem just and proper.


Dated:          July 13, 2009

RIVKIN RADLER LLP

By:_____
        Barry I. Levy (BL 2190)
        Michael Sirignano (MS 5263)
        Max Gershenoff (MG 4648)
926 RXR Plaza
Uniondale, New York  11556
(516) 357-3000

*Counsel for Plaintiff, State Farm Mutual Automobile Insurance Company*

**Exhibit 1**

Case 2:09-cv-02990-JS-WDW    Document 1-2    Filed 07/13/09    Page 38 of 50 PageID #: 40

# New York State Education Department

# Office of the Professions

### Summaries of Regents Actions on Professional Misconduct and Discipline

### December 10, 1998

Terms under which this information is provided.

---

Certified Public Accountancy - Chiropractic - Dentistry - Massage Therapy - Nursing - Professional Engineering and Land Surveying - Pharmacy - Veterinary Medicine

---

**Certified Public Accountancy**

**Michael S. Gawel**, Niagara Falls, NY
**Profession:** Certified Public Accountant; Lic. No. 040799; Cal. No. 17519
**Regents Action Date:** December 10, 1998
**Action:** Application to surrender license granted.
**Summary:** Licensee admitted to having been convicted of money laundering and aiding another to file a false federal personal income tax return.

---

**Chiropractic**

**Steven M. Tringali**, Smithtown, NY
**Profession:** Chiropractor; Lic. No. 004769; Cal. No. 17459
**Regents Action Date:** December 10, 1998
**Action:** Application for consent order granted; Penalty agreed upon: Censure and Reprimand, probation 1 year, $1,500 fine.
**Summary:** Licensee admitted to charge of inadequate record keeping in that records did not indicate dates of patient treatment.

**Steven M. Tringali, P.C.**, Hauppauge, NY
**Profession:** Chiropractic; Cal. No. 17460
**Regents Action Date:** December 10, 1998
**Action:** Application for consent order granted; Penalty agreed upon: Censure and Reprimand, probation

Case 2:09-cv-02990-JS-WDW   Document 1-2   Filed 07/13/09   Page 39 of 50 PageID #: 41

1 year.
**Summary:** Registrant admitted to charge of inadequate record keeping in that records did not indicate dates of patient treatment.

---

### Dentistry

**Barry L. Cohan**, Brooklyn, NY
**Profession:** Dentist; Lic. No. 036179; Cal. No. 14191
**Regents Action Date:** December 10, 1998
**Action:** Found guilty of professional misconduct; Penalty: 3 year suspension, execution of suspension stayed, probation 3 years, $5,000 fine.
**Summary:** Licensee was found guilty of failure to provide access to patient records, intentionally certifying and causing to be filed false claims forms to insurance companies, willfully filing such claims, and failing to maintain patient records for an appropriate period of time.

**Joseph Dumanski**, Port Jefferson, NY
**Profession:** Dentist; Lic. No. 034398; Cal. No. 16157
**Regents Action Date:** December 10, 1998
**Action:** Application for consent order granted; Penalty agreed upon: 1 year suspension, execution of suspension stayed, $5,000 fine.
**Summary:** Licensee did not contest charge that between 1992 and 1994 he billed for services not rendered to patients in his care.

**Joseph Dumanski Dental Offices, P.C.**, Coram, NY
**Profession:** Dentistry; Cal. No. 17096
**Regents Action Date:** December 10, 1998
**Action:** Application for consent order granted; Penalty agreed upon: 1 year suspension, execution of suspension stayed, $10,000 fine.
**Summary:** Respondent did not contest charge that between 1992 and 1994 it billed for services not rendered to patients in its care.

**Michael Petrovich Lukovsky**, Brooklyn, NY
**Profession:** Dentist; Lic. No. 045130; Cal. No. 17596
**Regents Action Date:** December 10, 1998
**Action:** Application for consent order granted; Penalty agreed upon: Suspension for not less than 2 years and until terminated as set forth in consent order application; upon termination of suspension, probation 2 years.
**Summary:** Licensee did not contest charge of physically and verbally abusing patients.

---

### Massage Therapy

**Paula C. Liguori**, Niagara Falls, NY; Lockport, NY
**Profession:** Massage Therapist; Lic. No. 002052; Cal. No. 17224

Case 2:09-cv-02990-JS-WDW Document 1-2 Filed 07/13/09 Page 40 of 50 PageID #: 42

**Regents Action Date:** December 10, 1998 (see also <u>November 2001</u>)
**Action:** Found guilty of professional misconduct; Penalty: 2 year suspension, execution of suspension stayed, probation 2 years.
**Summary:** Licensee was found guilty of having been convicted of Driving While Intoxicated, a misdemeanor; Operating A Motor Vehicle While In An Intoxicated Condition, a class E felony; and Aggravated Unlicensed Operation Of A Motor Vehicle in the Third Degree, a misdemeanor.

---

### Nursing

**Judith Ann Turner**, Hamburg, NY
**Profession:** Licensed Practical Nurse, Registered Professional Nurse; Lic. Nos. 197847, 409948; Cal. Nos. 13580, 13581
**Regents Action Date:** December 10, 1998
**Action:** Found guilty of professional misconduct; Penalty: Revocation.
**Summary:** Licensee was found guilty of willfully abusing senior patients physically and verbally on numerous occasions by actions such as force-feeding until the point of choking or vomiting, yelling and screaming at them, tearing of clothing and roughly grabbing them.

**Victoria Anne Rolfe a/k/a Victoria Anne Green**, North Babylon, NY
**Profession:** Licensed Practical Nurse, Registered Professional Nurse; Lic. Nos. 154993, 355378; Cal. Nos. 16783, 16782
**Regents Action Date:** December 10, 1998
**Action:** Application to surrender licenses granted.
**Summary:** Licensee could not successfully defend against charge of shaking an infant with excessive force, causing the infant's death, while rendering home nursing care to an infant.

**Robert Moses Cortes**, Mitchells, VA
**Profession:** Registered Professional Nurse; Lic. No. 481977; Cal. No. 17356
**Regents Action Date:** December 10, 1998
**Action:** Application to surrender license granted.
**Summary:** Licensee did not contest charge of having been convicted of four counts of Aggravated Sexual Battery, a felony and one count of Forcible Sodomy, a felony, in the Commonwealth of Virginia.

**Kathleen Jean Chesley**, Batavia, NY
**Profession:** Licensed Practical Nurse, Registered Professional Nurse; Lic. Nos. 177139, 384822; Cal. Nos. 17591, 17481
**Regents Action Date:** December 10, 1998
**Action:** Application to surrender licenses granted.
**Summary:** Licensee admitted to charge of committing several medication errors and omissions.

**Susan Gail Kile a/k/a Susan Johnson**, Cedar Lake, IN
**Profession:** Licensed Practical Nurse; 46303; Lic. No. 226952; Cal. No. 16466
**Regents Action Date:** December 10, 1998
**Action:** Application for consent order granted; Penalty agreed upon: 2 year suspension, execution of suspension stayed, probation 2 years to commence if and when return to practice, $250 fine.
**Summary:** Licensee admitted to charge of failing to disclose three (3) prior out-of-state criminal convictions.

Case 2:09-cv-02990-JS-WDW   Document 1-2   Filed 07/13/09   Page 41 of 50 PageID #: 43

**Daniel Myron Bush**, Rochester, NY
**Profession:** Licensed Practical Nurse; Lic. No. 217698; Cal. No. 16723
**Regents Action Date:** December 10, 1998
**Action:** Application for consent order granted; Penalty agreed upon: 2 year suspension, execution of suspension stayed, probation 2 years, $250 fine.
**Summary:** Licensee did not contest charge of making medication administration and documentation errors.

**Robin Lee Rath-Summerson**, Freeport, NY
**Profession:** Registered Professional Nurse; Lic. No. 489861; Cal. No. 17265
**Regents Action Date:** December 10, 1998
**Action:** Application for consent order granted; Penalty agreed upon: Censure and Reprimand, probation 1 year, $1,500 fine.
**Summary:** Licensee did not contest charge of submitting false document in order to obtain employment.

**Thomas Joseph Drzymala**, Angola, NY
**Profession:** Licensed Practical Nurse, Registered Professional Nurse; Lic. Nos. 177512, 385369; Cal. Nos. 17328, 17329
**Regents Action Date:** December 10, 1998 (see also September 2005)
**Action:** Application for consent order granted; Penalty agreed upon: 2 year suspension, execution of suspension stayed, probation 2 years, 100 hours of public service.
**Summary:** Licensee admitted to charge of having been convicted of Criminal Possession of Marijuana in the Third Degree, a class E felony.

**Bruce Vivier Wiseley**, Batavia, NY
**Profession:** Licensed Practical Nurse; Lic. No. 223341; Cal. No. 17330
**Regents Action Date:** December 10, 1998 (see also December 1994)
**Action:** Application for consent order granted; Penalty agreed upon: 36 month suspension with leave to apply for early termination as set forth in consent order application; following service or termination of suspension, probation 2 years; above penalty and probation shall supersede and be in satisfaction of probation previously set forth in Commissioner's Order No. 14913 and therefore said probation previously set forth in said Order No. 14913 need not be served.
**Summary:** Licensee admitted to charge of having been convicted of Petit Larceny, a class A misdemeanor.

**Jesus Vidot**, Albany, NY
**Profession:** Licensed Practical Nurse; Lic. No. 184048; Cal. No. 17367
**Regents Action Date:** December 10, 1998
**Action:** Application for consent order granted; Penalty agreed upon: 2 year suspension, execution of suspension stayed, probation 2 years, $500 fine.
**Summary:** Licensee admitted to having been convicted of Criminal Possession of a Controlled Substance in the Seventh Degree, a class A misdemeanor on two occasions.

**Tressa Maria Chirico**, West Islip, NY
**Profession:** Registered Professional Nurse; Lic. No. 466008; Cal. No. 17413
**Regents Action Date:** December 10, 1998
**Action:** Application for consent order granted; Penalty agreed upon: 1 year suspension, execution of suspension stayed, probation 1 year, $1,000 fine.
**Summary:** Licensee admitted to charge of failing to notice wrong pain medication was infusing into a post-operative patient.

**Kathleen Ann O'Farrell**, Bethel, AK

Case 2:09-cv-02990-JS-WDW   Document 1-2   Filed 07/13/09   Page 42 of 50 PageID #: 44

**Profession:** Registered Professional Nurse, Lic. No. 479208; Cal. No. 17442
**Regents Action Date:** December 10, 1998
**Action:** Application for consent order granted; Penalty agreed upon: 2 year suspension, execution of suspension stayed, probation 2 years, $1,500 fine.
**Summary:** Licensee admitted to charge of incorrectly infusing medications on two occasions and administering the wrong dose of medication on one occasion.

**Frank Joseph Gilberti**, Utica, NY
**Profession:** Registered Professional Nurse; 13501; Lic. No. 401390; Cal. No. 17518
**Regents Action Date:** December 10, 1998 (see also January 2004)
**Action:** Application for consent order granted; Penalty agreed upon: 1 year suspension, execution of suspension stayed, probation 1 year, $1,000 fine.
**Summary:** Licensee admitted to charge of submitting a false time sheet for a home visit not made.

---

### Pharmacy

**Ernest Fred Marasa**, Sonyea, NY; Fairport, NY
**Profession:** Pharmacist; Lic. No. 036147; Cal. No. 17151
**Regents Action Date:** December 10, 1998
**Action:** Found guilty of professional misconduct; Penalty: Revocation.
**Summary:** Licensee was found guilty of having been convicted of the crime Burglary in the Second Degree, a class C felony as well as the crime of Criminal Contempt in the First Degree, a class E felony.

**Louis Laricchia**, White Plains, NY
**Profession:** Pharmacist; Lic. No. 023539; Cal. No. 17237
**Regents Action Date:** December 10, 1998
**Action:** Found guilty of professional misconduct; Penalty: Revocation.
**Summary:** Licensee was found guilty of having been convicted of the crime of Criminal Diversion of Prescription Medications and Prescriptions in the Fourth Degree, a class A misdemeanor.

**Frank H. Silverman**, Long Beach, NY; Long Island City, NY
**Profession:** Pharmacist; Lic. No. 022862; Cal. No. 17296
**Regents Action Date:** December 10, 1998
**Action:** Found guilty of professional misconduct; Penalty: Revocation.
**Summary:** Licensee was found guilty of having been convicted of the crime of Grand Larceny in the Third Degree, a class D felony.

**Edwin Levinstim**, Katonah, NY
**Profession:** Pharmacist; Lic. No. 030894; Cal. No. 17465
**Regents Action Date:** December 10, 1998
**Action:** Application to surrender license granted.
**Summary:** Licensee admitted to having been convicted of Criminal Diversion of Prescription Medications and Prescriptions in the Third Degree, a class E felony.

**Alexander Gurevich**, Albany, NY
**Profession:** Pharmacist; Lic. No. 041039; Cal. No. 16278
**Regents Action Date:** December 10, 1998

Case 2:09-cv-02990-JS-WDW   Document 1-2   Filed 07/13/09   Page 43 of 50 PageID #: 45

**Action:** Application for consent order granted; Penalty agreed upon: 1 year suspension, execution of suspension stayed, probation 1 year, $500 fine.
**Summary:** Licensee did not contest charge that he failed to review an order for an extremely high dose of dextrose with appropriate hospital personnel.

**David B. Krenn,** Delmar, NY
**Profession:** Pharmacist; Lic. No. 032207; Cal. No. 16279
**Regents Action Date:** December 10, 1998
**Action:** Application for consent order granted; Penalty agreed upon: 1 year suspension, execution of suspension stayed, probation 1 year, $500 fine.
**Summary:** Licensee did not contest charge that he failed to review an order for an extremely high dose of dextrose with appropriate hospital personnel.

---

### Professional Engineering and Land Surveying

**William K. Morse,** Baldwin, NY
**Profession:** Land Surveyor; Lic. No. 033701; Cal. No. 17253
**Regents Action Date:** December 10, 1998
**Action:** Application for consent order granted; Penalty agreed upon: 2 year suspension, execution of last 21 months of suspension stayed, probation 2 years, $5,000 fine.
**Summary:** Licensee admitted to charge of affixing seal and signature to land surveys not prepared directly under his supervision.

---

### Veterinary Medicine

**Burton D. Miller,** Riverhead, NY
**Profession:** Veterinarian; Lic. No. 004578; Cal. No. 17352
**Regents Action Date:** December 10, 1998
**Action:** Application for consent order granted; Penalty agreed upon: 2 year suspension, execution of suspension stayed, probation 2 years, $1,000 fine.
**Summary:** Licensee admitted to charge of delegating professional responsibilities to unlicensed individuals.

**Riverhead Animal Hospital, P.C.,** 1182 West Main Street, Riverhead, NY
**Profession:** Veterinary Medicine; Cal. No. 17353
**Regents Action Date:** December 10, 1998
**Action:** Application for consent order granted; Penalty agreed upon: $1,000 fine.
**Summary:** Respondent admitted to charge of delegating professional responsibilities to unlicensed individuals.

---

Case 2:09-cv-02990-JS-WDW   Document 1-2   Filed 07/13/09   Page 44 of 50 PageID #: 46

*For further information: dplsdsu@mail.nysed.gov*

*Last Update: October 17, 2005*

Back to Office of the Professions Homepage

Exhibit 2

GK/AA
F.# 2005R02177

UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF NEW YORK

- - - - - - - - - - - - - - - - -X

UNITED STATES OF AMERICA

    - against -

BARRY COHAN,

           Defendant.

**BLOCK, J.**

**GOLD, M.J.**

**I N D I C T M E N T**

Cr. N **CR-07 841**
(T. 18, U.S.C., §§ 1035(a)(1),
1035(a)(2), 1347, 2 and
3551 et seq.; T. 21,
U.S.C., § 853(p))

- - - - - - - - - - - - - - - - -X

THE GRAND JURY CHARGES:

**FILED**
IN CLERK'S OFFICE
U.S. DISTRICT COURT E.D.N.Y

★ NOV 16 2007 ★

BROOKLYN OFFICE

<u>INTRODUCTION</u>

    At all times relevant to this Indictment, unless otherwise indicated:

    1.    The defendant BARRY COHAN was a dentist licensed by the State of New York.  COHAN maintained a general dental practice with offices at 38 West Park Avenue, Long Beach, New York (the "Long Beach Office"), and 8103 Avenue M, Brooklyn, New York (the "Brooklyn Office").

<u>The Port Authority Plan</u>

    2.    The defendant BARRY COHAN treated numerous patients employed as police officers by the Port Authority of New York and New Jersey ("the Port Authority").  The Port Authority provided those officers, as well as its other employees, with dental insurance ("the Port Authority Plan").  The Port Authority Plan was a self-insured health care benefit program, within the meaning of

2

Title 18, United States Code, Section 24(b). The Port Authority
Plan was administered by MetLife, and the Port Authority paid
claims with its own funds.

3.    Reimbursements under the Port Authority Plan were
initially capped based on a determination by the Port Authority as
to what constituted the "reasonable and customary" fees for the
services being provided. Subject to this cap, routine preventative
care administered to Port Authority personnel and their dependents
was reimbursed in full, while other dental procedures were
reimbursed at a rate of 80%, with a required 20% patient co-
payment. Certain cosmetic procedures were not covered. In
approximately July 2004, the Port Authority lifted the cap and
began reimbursing dentists based on their own reported fees without
imposing any ceiling on reimbursements.

4.    In order to be reimbursed under the Port Authority
Plan, the defendant BARRY COHAN and his office staff prepared and
submitted claim forms to MetLife. Among other things, these forms
identified the patient treated, the date(s) of treatment, the
procedure(s) performed, and the fee(s) charged. Each claim form
included a certification by COHAN that "the procedures as indicated
by date have been completed and that the fees submitted are the
actual fees I have charged and intend to collect for those
procedures."

The Fraud Scheme

5.    From on or about July 1, 2004 through May 1, 2006,

3

the defendant BARRY COHAN submitted and caused to be submitted false and misleading claim forms to MetLife seeking reimbursement for procedures purportedly administered to Port Authority employees and their dependants.  These claim forms were false and fraudulent in one or more of the ways set forth below.

A.    Fraudulent Billing at Inflated Rates

6.    Once the Port Authority lifted its "reasonable and customary" cap, the defendant BARRY COHAN and office personnel acting under his direction began submitting claim forms to MetLife seeking reimbursement at substantially inflated rates for COHAN's treatment of Port Authority patients.

7.    The defendant BARRY COHAN falsely represented in these claim forms that the rates listed for particular procedures were his "actual fees."  In fact, the listed rates far exceeded both the amounts set forth in COHAN's own internal fee schedule and the amounts that COHAN charged for identical procedures performed on non-Port Authority patients.

8.    The defendant BARRY COHAN also falsely represented in these claim forms that he had "charged" and "intend[ed] to collect" the listed fees.  In fact, COHAN did not intend to collect the portion of those fees owed by his Port Authority patients and did not charge those patients their required co-payments or deductibles.

9.    The defendant BARRY COHAN accepted numerous checks

4

from MetLife, paid for with Port Authority funds, that reimbursed
him at the inflated billing rates set forth in his claim forms.
COHAN deposited those checks into bank accounts under his control.

B.   Fraudulent Billing for Services not Rendered

10.   The defendant BARRY COHAN also submitted and caused
to be submitted claim forms to MetLife stating that he had
performed various dental procedures for Port Authority patients
when, as COHAN well knew and believed, he had not actually
performed those procedures.

11.   On several occasions, the defendant BARRY COHAN
performed cosmetic dental procedures on Port Authority patients
that were excluded from coverage under the Port Authority Plan.
COHAN then submitted claims forms to MetLife seeking reimbursement
for entirely different, non-cosmetic dental procedures that were
not excluded from coverage.

12.   One cosmetic orthodontic procedure that the
defendant BARRY COHAN performed on several Port Authority patients
was an advanced form of braces called "Invisalign."  Invisalign was
not reimbursable under the Port Authority Plan.  COHAN instead
submitted claim forms to MetLife in the names of these patients
seeking reimbursement for various other dental procedures that he
had not actually performed, including "periodontal scaling and root
planing" ("PSRP"), osseos-surgery and gingivectomy.

13.   The defendant BARRY COHAN accepted numerous checks

from MetLife, paid for with Port Authority funds, that reimbursed him for services that he had not actually rendered. COHAN deposited those checks into bank accounts under his control.

C.    Fraudulent Billing in the Name of Another Provider

14.    In or about August 2005, the Port Authority stopped making payments on claims submitted by the defendant BARRY COHAN pending investigation into his rates and billing practices. Recognizing that the Port Authority was no longer reimbursing claims submitted in his name, COHAN submitted a series of claim forms to MetLife in the name of another dentist who maintained a separate practice at COHAN's Brooklyn Office. COHAN submitted these claim forms without the other dentist's knowledge or consent and when, as COHAN well knew and believed, it was he, and not the other provider, who had performed the procedures listed on the forms.

15.    The defendant BARRY COHAN accepted checks from MetLife, paid for with Port Authority funds, which reimbursed the services that COHAN had claimed under the other provider's name. COHAN deposited those checks into bank accounts under his control.

COUNT ONE
(Health Care Fraud)

16.    The allegations contained in paragraphs one through fifteen are realleged and incorporated as if fully set forth in this paragraph.

17.    In or about and between July 1, 2004 through May 1,